## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| KYLE A. SMOKE<br>251 Park Ridge Ln.<br>Newark, OH 43055<br><br>*and*<br><br>JENNIFER M. MCINTYRE<br>2360 Glory Dr.<br>Waterford, PA 16441<br><br>Plaintiffs,<br>*on Behalf of Themselves and*<br>*Others Similarly Situated*<br><br>v.<br><br>CHRISTINE WORMUTH, *in her official*<br>*capacity as United States Secretary of the Army*<br>101 Army Pentagon<br>Washington, DC 20301-1000<br><br>Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No.: _____<br><br><br>**CLASS ACTION COMPLAINT FOR<br>DECLARATORY AND INJUNCTIVE<br>RELIEF** |

## INTRODUCTION

1.     This lawsuit challenges the United States Army Physical Evaluation Board's ("PEB") unlawful policy that denies soldiers the "combat-related" finding to which they are entitled to under 26 U.S.C. § 104 when they are medically retired for certain combat-related injuries.  Specifically, the Army PEB refuses to find that injuries presumptively caused by exposure to military burn pits—an instrumentality of war ("IOW") used by the military in post-9/11 military operations in Afghanistan, Iraq, and Southwest Asia[1]—are "combat-related."  This

---

[1] The DoD defines an "open-air burn pit" as "[a]n area, not containing an incinerator or other equipment specifically designed for burning of solid waste, designated for the purpose of disposing of solid waste by burning in the outdoor air at a location with more than 100 attached or assigned personnel and that is in place longer than 90 days."  DoDI No. 4715.19, Use of Open-Air Burn Pits in Contingency Operations (Feb. 15, 2011) ("DoDI 4715.19").

refusal has harmed Plaintiffs and those similarly situated, because had their injuries properly been classified as caused by an IOW, their disability retirement pay would be tax free. Despite the military having mandated the use of open-air burn pits in these post-9/11 military operations, the Army PEB continues to refuse to recognize burn pits as an IOW.  On behalf of Plaintiffs Kyle A. Smoke, Jennifer M. McIntyre, and all others similarly situated, this class action asks the Court for injunctive relief to require the Army PEB to recognize burn pits as "instrumentalities of war," such that soldiers who are medically retired for a disability presumptively incurred in the line of duty due to burn pit exposure under the recent Sergeant First Class Heath Robinson Honoring our Promise to Address Comprehensive Toxics ("PACT") Act legislation, 38 U.S.C. § 1120, are eligible for the tax-free retirement that they deserve.

## JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this case raises federal questions under the Administrative Procedure Act, 5 U.S.C. § 702 *et seq*. ("APA").

3.      This Court is authorized to grant the relief requested pursuant to the APA, 5 U.S.C. § 706, and the Declaratory Judgment Act, 28 U.S.C. § 2201.

4.      Plaintiffs seek a court order requiring the Army to conclude that an unfitting disability did result from a combat-related injury under 26 U.S.C. § 104 whenever that disability is one that is presumptively granted Department of Veterans Affairs ("VA") service connection under the PACT Act due to exposure to burn pits while assigned to a duty station in Bahrain, Iraq, Kuwait, Oman, Qatar, Saudi Arabia, Somalia, or the United Arab Emirates on or after August 2, 1990; or while assigned to a duty station in Afghanistan, Djibouti, Egypt, Jordan, Lebanon, Syria, Yemen, Uzbekistan (or any other country determined relevant by the Secretary of Veterans Affairs pursuant to 38 U.S.C. § 1119(c)(1)(B)(ix)) on or after September 11, 2001.

5.      Diseases covered by the PACT Act's burn pit presumptions include, without limitation, "asthma that was diagnosed after service of the covered veteran" and certain types of cancer, including breast cancer (collectively, "PACT Act Conditions").  38 U.S.C. § 1119(b)(1), (2).

6.      Plaintiffs sought relief for this issue before the Formal PEB ("FPEB") and the Army Physical Disability Agency ("PDA").  Both were denied.

7.      The Army subsequently medically retired each Plaintiff for their unfitting PACT Act Conditions with orders that indicate that their unfitting PACT Act Conditions are not "based on injury or disease received in [the line of duty] as a direct result of Armed Conflict [nor] caused by an instrumentality of war and incurred in the [line of duty] during a war period as defined by law."

8.      These PDA decisions constitute final agency action for which there is no other adequate remedy in court. 5 U.S.C. § 704.

9.      This Court is the appropriate venue pursuant to 28 U.S.C. § 1391(e) because the Secretary of the Army is an officer of the United States and because a substantial part of the acts or omissions giving rise to this lawsuit took place in the District of Columbia.  Venue is also proper under 5 U.S.C. § 703 because this is a court of competent jurisdiction.

10.      In accordance with 28 U.S.C. § 2401(a), this action is brought within six years of the PDA's decisions denying relief.

## PARTIES

11.      Plaintiff Sergeant First Class ("SFC") Kyle A. Smoke is a citizen of the United States, a veteran of the United States Army, and a resident of Newark, Ohio.

12.      Plaintiff Lieutenant Colonel ("LTC") Jennifer M. McIntyre is a citizen of the United States, a veteran of the United States Army, and a resident of Waterford, Pennsylvania.

13.    Defendant Christine Wormuth, 101 Army Pentagon, Washington, District of Columbia 20301, is the Secretary of the Army.  The Secretary is the head of the Department of the Army, which is a branch of the Department of Defense ("DoD").  The DoD is an agency of the United States as defined by the APA, 5 U.S.C. § 701(b)(1), and for purposes of venue as described in 28 U.S.C. § 1391(e)(1).

## FACTUAL ALLEGATIONS

### Plaintiff Smoke

14.    SFC Smoke enlisted in the Army on April 6, 2005.

15.    During his service, SFC Smoke was awarded numerous medals, including two Army Commendation Medals, the Army Achievement Medal, and the Army Good Conduct Medal, among others.

16.    SFC Smoke deployed to Iraq from 2006 to 2007 and again from 2008 and 2009, where he was exposed to burn pits.

17.    Leading up to 2016, SFC Smoke began experiencing increased cardiovascular issues that directly affected his ability to serve.  What began as a shortness of breath soon developed into debilitating condition that rendered him unable to perform any significant military duties.  In 2018, SFC Smoke was ultimately diagnosed with severely duty-limiting asthma despite having no chronic lung disease prior to his exposure to smoke from open burn pits during his deployments.

18.    On July 20, 2022, SFC Smoke was referred into the Disability Evaluation System process for his asthma.  On September 5, 2022, the Medical Evaluation Board ("MEB") found that SFC Smoke did not meet retention standards due to the severity of his asthma.

19.    On October 21, 2022, the Informal PEB ("IPEB") determined SFC Smoke's asthma was unfitting and awarded SFC Smoke a 30% disability rating for his asthma, entitling him to a

medical retirement.  The IPEB also concluded that the disability did not result from a combat-related injury under 26 U.S.C. § 104 and was not caused by an IOW.

20.    SFC Smoke disagreed with the IPEB's conclusion regarding whether his asthma was "combat-related" due to being caused by an IOW.  He timely filed an objection on October 31, 2022 and requested a formal hearing.  During the reconsideration proceedings, SFC Smoke submitted a sworn statement that he was exposed to burn pits on a near-daily basis while serving in Iraq.  For example, when SFC Smoke was stationed in Patrol Base Summers between November 2008 and October 2009, he lived, slept, exercised, and worked just a few hundred feet away from a burn pit.  The Army also required him to participate in a physical fitness test near the burn pits, which involved running through the burn pit's smoke.

21.    The FPEB issued its ruling on March 30, 2023, determining that SFC Smoke's disability was the result of an IOW and did result from a combat-related injury under 26 U.S.C. § 104.  In making this determination, the FPEB expressly cited to SFC Smoke's testimony that "while on Patrol Base Summers he lived, slept, exercised, and worked approximately within 150 - 200 feet from the centrally located burn pit.  [SFC Smoke] testified that he frequently experienced burning sensation in his eyes, nose, throat, and chest and was treated by medical personnel for respiratory infections while in theatre."

22.    A dissenting member of the FPEB filed a "minority report," which is intended to serve as a record of the partial dissent from the FPEB's published majority opinion.  The minority report noted that SFC Smoke had been "awarded a V4 Code as having incurred his condition in a combat zone due to his presumptive onset from exposure to a burn pit while deployed" and "agreed" that decision was appropriate.  However, the minority report drew a distinction between his asthma being caused by a burn pit and that burn pit being deemed an instrumentality of war.

The author opined that "there was insufficient evidence that the condition was caused by an instrumentality of war" and that Smoke's "disability was not . . . caused by an instrumentality of war." The minority report added that "there was insufficient evidence provided suggesting that the items burned in the burn pit or associated fumes and gases that [SFC Smoke] was exposed to were uniquely military in nature."

23.    The PDA, required to do a mandatory review because of the minority report, issued a new ruling on May 8, 2023 that reversed the FPEB's March 30 decision. The PDA explained its reversal, stating "an error of adjudication was made during the [FPEB] proceedings" and concluded that the "designation for instrumentality of war was erroneously applied." The PDA also stated that "[a]ccording to current policies and regulations, burn pits . . . do not rise to the level of being . . . an instrumentality of war." Notably, the PDA did not disturb or question the prior findings that SFC Smoke was "awarded a V4 combat zone designation code for a condition that had a presumptive onset from exposure to a burn pit while deployed to a hazardous duty location."

24.    SFC Smoke appealed the PDA's reversal and was denied. In August 2023, the Board found that the "case was properly adjudicated . . . in accordance with the rules that govern the Physical Disability Evaluation System in making its determination."

25.    On August 22, 2023, the Army issued SFC Smoke's retirement orders, with an erroneous administrative finding that SFC Smoke's disability is not "based on injury or disease received in [the line of duty] as a direct result of Armed Conflict [nor] caused by an instrumentality of war and incurred in the [line of duty] during a war period as defined by law," and also that his disability is not "from a combat-related injury as defined in 26 U.S.C. 104."

26.    On November 14, 2023, SFC Smoke submitted a claim for Combat-Related Special Compensation ("CRSC") with the Army's CRSC Board for his disabilities incurred during service, including his asthma, among other claims.

27.    On May 1, 2024, the Army's CRSC Board approved his asthma claim, verifying that his "asthma [burn pit exposure]" was a "verified disability as combat-related due to an Instrumentality of War" and assigning the Combat Code "IN," meaning that the CRSC Board attributed his condition to an IOW.

28.    As a result of the Army's determination that SFC Smoke's asthma was not caused by an IOW, SFC Smoke has been and continues to be required to pay taxes on his disability retirement payment.  Declaratory and injunctive relief from this Court would redress this injury.

**Plaintiff McIntyre**

29.    LTC McIntyre accepted a commission in the Army on May 24, 2004.

30.    LTC McIntyre served on Active Duty from May 25, 2004 to February 5, 2016.

31.    LTC McIntyre was deployed to Iraq and Afghanistan four times from 2004 to 2021 where she was exposed to burn pits.

32.    On February 5, 2016, LTC McIntyre was honorably discharged from Active Duty.

33.    On March 26, 2016, LTC McIntyre was appointed as a Reserve commissioned officer of the Army.

34.    LTC McIntyre received numerous awards and medals for her service in the Army, and upon discharge, her Commander wrote that she "has served with distinction as a leader throughout her career . . . [and] exemplified the Army values by ensuring that maximum support to the warfighter was always the priority during the course of her duties.  Her talents as a leader,

trainer, and planner along with her tireless and intense work ethic will be sorely missed in our formation."

35.    LTC McIntyre sought treatment for a breast lump while on active duty in 2016. The lump was thought to be muscular in etiology and became palpably larger in January 2022. Biopsy and further evaluation demonstrated high-grade metastatic carcinoma (also commonly known as breast cancer).  On February 28, 2022, LTC McIntyre started palliative chemotherapy, which is intended to help manage symptoms and potentially extend her life.  Her cancer, however, is incurable.  She underwent radiation to a right hip acetabular metastasis, and additional metastases were found in her liver, sternum, and spine.

36.    In October of 2022, the MEB found that LTC McIntyre did not meet retention standards based on a diagnosis of right breast invasive carcinoma, painful bone metastasis of breast cancer, liver and lymph node metastasis of breast cancer, and residual diarrhea resulting from chemotherapy.

37.    In November of 2022, the IPEB found LTC McIntyre's breast cancer physically unfitting with a 100% rating and recommended permanent disability retirement.  The IPEB determined that LTC McIntyre's breast cancer was connected to military service due its incurrence during active duty.

38.    However, the IPEB determined that her unfitting breast cancer "did not result from a combat-related injury under the provisions of 26 USC 104 or 10 USC 10216."  The IPEB further concluded that "the disability disposition is not based on disease or injury . . . caused by an instrumentality of war.  LTC McIntyre disagreed with the IPEB's conclusion that her breast cancer was not "combat-related" and not caused by an IOW.  She timely filed an objection, requesting a FPEB hearing.

39.    LTC McIntyre argued at the FPEB that her exposure to burn pits caused her cancer. On June 8, 2023, LTC McIntyre testified to the FPEB that during her four deployments to Iraq and Afghanistan, she lived and worked within 1.5-2.0 miles from burn pits, and possibly even closer, resulting in near-constant exposure to fumes from a burn pit.  In particular, she testified that she had an increased exposure to burn pits during her first deployment to Camp Liberty in Iraq because she did not have a vehicle and had to walk everywhere.  She also testified that she "was able to smell the fume from the burn pits and see smoke as well," and that "she and her soldiers exercised and took Army physical training tests outside."  She testified that she did not know what was being burned nor did she ever place items into the burn pits.

40.    The FPEB, in May of 2023, determined that her breast cancer did not result from a combat-related injury under 26 U.S.C. § 104 because "the mere presence of being in Afghanistan and Iraq does not correlate to [McIntyre's] condition having a direct causal relationship to . . . an instrumentality of war."  The FPEB further stated that LTC McIntyre's "disability disposition is not based on disease or injury . . . caused by an instrumentality of war."

41.    The FPEB reached this conclusion despite its own findings that: (A) LTC McIntyre was exposed to burn pits and their toxic fumes during all four of her deployments to Iraq and Afghanistan; (B) her cancer was incurred in the line of duty in a combat zone; and (C) it was in this same line of duty in a combat zone that she was exposed to burn pits; as well as the military's own reports and testimony support that these military burn pits were designed primarily for military use.

42.    In June of 2023, LTC McIntyre submitted a rebuttal to the FPEB's conclusion to the Army PDA.  The PDA upheld the FPEB's findings, concluding that burn pits do not automatically constitute an IOW.  The PDA also stated that it is uncertain whether the items burned

inside the burn pits to which LTC McIntyre was exposed were themselves IOWs, as non-IOWs (*e.g.*, drywall) were included in burn pits as well.  Nevertheless, the PDA conceded that PACT Act Conditions, such as LTC McIntyre's cancer, are presumed incurred or aggravated from service in a combat zone.

43.    On September 12, 2023, LTC McIntyre was medically retired after over 19 years of service for her unfitting breast cancer with an erroneous administrative finding that her cancer was not combat-related due to an IOW.  She continues to get treatment for her breast cancer every three weeks.

44.    On December 13, 2023, LTC McIntyre submitted a claim for CRSC with the Army's CRSC Board for her disabilities incurred during service, including her carcinoma.

45.    On May 22, 2024, the Army's CRSC Board approved her claim, verifying that her carcinoma "qualifies under the PACT Act" and assigning the Combat Code for IOWs for her condition.  In other words, the CRSC Board concluded that her carcinoma was a combat-related disability due to an IOW.

46.    As a result of the Army's determination that LTC McIntyre's breast cancer was not caused by an IOW, LTC McIntyre has been and continues to be required to pay taxes on her disability retirement payment.  Declaratory and injunctive relief from this Court would redress this injury.

### The Medical Retirement Process

47.    Chapter 61 of Title 10 of the United States Code establishes the process through which the Army (and other military branches) discharges disabled service members.  It authorizes the Secretaries of the military branches to discharge military personnel who are found to be unfit for continued military service due to physical disability.

48.     The first step in the Disability Evaluation System process is evaluation by the MEB. The servicemember undergoes a medical examination with the VA, and then an MEB physician reviews the VA examinations and the servicemember's treatment records to determine whether the servicemember meets medical retention standards.  If the MEB determines that the service member has one or more physical conditions that fall below retention standards, it refers the servicemember to an IPEB for a fitness determination.  *See* DoD Instruction ("DoDI") 1332.18, § 3.3.

49.     The IPEB reviews the servicemember's medical information and makes a determination of whether he or she is fit to remain in the military.  If the IPEB finds a service member fit, the service member will be returned to duty.  If the IPEB determines one or more of the service member's conditions are unfitting, the IPEB will refer the service member's case to the VA for the assignment of a preliminary disability rating for each unfitting condition pursuant to the VA Schedule for Rating Disabilities.  A service member who is provided a combined disability rating of 30% or higher for one or more unfitting condition(s) is eligible for a military disability retirement.  *See* 10 U.S.C. § 1201.

50.     The IPEB also must determine whether a service member's unfitting disability(s) is "combat-related" such that their disability retirement payment will be tax-free.  DoDI 1332.18, § 10.2, "Administrative Determinations."  Where the PEB determines that a service member's unfitting disability(s) are combat-related, the disability retirement pay "will be excluded from Federal gross income in accordance with Section 104 of Title 26, U.S.C."  DoDI 1332.18, § 10.2.

51.     One way for a service member's disability to be considered "combat-related" is if the preponderance of evidence shows that it was incurred as a result of an Instrumentality of War. 26 U.S.C. § 104(b)(3)(B).

52.    DoDI 1332.18, § G.2 defines an "instrumentality of war" as a "vehicle, vessel, or device designed primarily for military service and in use by a military service at the time of the occurrence or injury."  The Instruction further provides that "if the disability was incurred during *any* period of service as a result of . . . injury or sickness *caused by fumes*, *gases*, or explosion of military ordnance, vehicles, or material, the criteria will be met" (emphasis added).  DoDI 1332.18 § 10.2.

53.    The PDA further explains in its 2021 "Approved Combat Related Information Paper," that in order to be determined to have been caused by an IOW, "the disability must be incurred incident to a hazard or risk of service.  That is not to say that the IOW was used for its designed intended military use, but rather that it was intentioned for use in the service at the time of the occurrence or injury.  The use of or occurrence from the IOW must differ from 'the use or occurrence under similar circumstances in civilian pursuits.'  The decision to find a condition was caused by an IOW is not determined by the geographical location of where the injury occurred, nor does it have to have been incurred or aggravated in a combat zone."  U.S. Army Physical Disability Agency's Guide For Disabilities Resulting from: Armed Conflict; Instrumentalities of War; Conditions Simulating War; and Disabilities Incurred in a Combat Zone (May 13, 2021). The PDA's information paper also indicates that items like parachutes, although also used in the civilian context, can be IOWs "because of the high injury rate, the extra military equipment carried, the exiting of a military aircraft, and the historical aspects of parachute development . . . Moreover, military parachutes are specifically designed for use in combat operations that are unique to the Services.  Military parachuting also subjects Soldiers to a hazard peculiar to military service and, thus, becomes an IOW."  *Id*.  Just as a parachute can be an instrumentality of war when used in

military operations, a burn pit also is an instrumentality of war when used at the site of a military forward operating base pursuant to the specific guidelines set forth by the Army.

54.     At the conclusion of the IPEB process, the service member has the option to either (A) accept the IPEB findings and VA preliminary disability ratings; or (B) appeal the IPEB findings to the FPEB, including any administrative decisions regarding combat-relation.

55.     A service member who appeals the IPEB findings is subsequently scheduled for a hearing before the FPEB.  *See* DoDI 1332.18, § 3.3.  At the FPEB, the service member will be entitled to address issues pertaining to his or her fitness as well as whether the unfitting disability is "combat-related." *Id.*

56.     Once the appeal, or "rebuttal," is received, the FPEB reviews all the evidence of the case, holds a formal hearing, and makes a final ruling for the PEB, either upholding the IPEB's original decision or replacing it with its own.

57.     Once the final decision has been issued by the PEB, the case is sent to the PDA for review of the PEB findings and recommendations.  The PDA has the authority to issue revised findings or return a case to the PEB for reconsideration if the evidence of record does not support the PEB findings and/or recommendation.  While the service member does not have an additional opportunity to make his or her own submission to the PDA, he or she is entitled to submit a written rebuttal in the event that the PDA issues revised findings that alter the disability determination. Department of the Army, *Disability Evaluation for Retention, Retirement, or Separation*, Army Regulation 635-40, para. 4-22 (Jan. 19, 2017).[2]

---

[2] Under Section 711 of the National Defense Authorization Act for Fiscal Year 2023, service members may also appeal via hearing. National Defense Authorization Act for Fiscal Year 2023, 33 USC § 711 (2023).

**Combat-Related Special Compensation**

58.    Congress created CRSC benefits to provide extra compensation to military retirees whose disabilities are combat-related.  *See* 10 U.S.C. § 1413a.  To be eligible for CRSC, an applicant must be: (A) a military retiree, (B) "entitled to retired pay" (except in certain instances not relevant here), and (C) with "a combat-related disability" for which the VA has awarded service-connected disability compensation. *Id*. § 1413a(c).  A "combat-related disability" includes a disability incurred "through an instrumentality of war."  *Id.* § 1413a(e). CRSC is not taxable.

59.    CRSC determinations must be "based on the preponderance of the evidence." Moreover, CRSC Guidance defines IOW as a "vehicle, vessel, or device designed primarily for Military Service and intended for use in such Service at the time of the occurrence or injury."  *Id*. at Att. 1-2.[3]  It also includes "such instrumentalities not designed primarily for Military Service if use of or occurrence involving such instrumentality subjects the individual to a hazard peculiar to Military Service."  *Id*. at Att. 2.  The CRSC Guidance further provides that a disability may be found to be the result of an IOW "if the disability was incurred in *any* period of service as a result of such diverse causes as . . . injury or sickness *caused by fumes, gases*, or explosion of military ordnance, vehicles, or material."  *Id*. (emphasis added).

60.    Since the passage of the PACT Act (discussed below), the Army CRSC Board has repeatedly awarded CRSC for conditions covered by the PACT Act, such as asthma or breast cancer diagnosed after exposure to burn pits, after finding them to be a "verified disability as combat-related due to an Instrumentality of War."

---

[3] The DoD does not define "device" in its Dictionary of Military and Associated Terms, but the DoD broadly uses the term in a manner not limited to mechanical objects.  For example, a "radiological dispersal device" is a type of "improved assembly or process," and a "directed-energy device" is a type of "system."

**Burn Pits**

**History of the Army's Use of Burn Pits in War**

61.    The DoD defines an "open-air burn pit" as an "area, not containing an incinerator or other equipment specifically designed for burning of solid waste, designated for the purpose of disposing of solid waste by burning in the outdoor air at a location with more than 100 attached or assigned personnel and that is in place longer than 90 days." DoDI No. 4715.19.

62.    The military mandated the use of open-air burn pits in post-9/11 military operations in Afghanistan, Iraq, and Southwest Asia. *See Metzger v. KBR, Inc.*, 893 F.3d 241, 262 (4th Cir. 2018) ("The record overwhelmingly shows that the military not only authorized but mandated the use of burn pits.").

63.    For example, during the Iraqi war in 2003, the military "issued the order . . . to all forces in [Iraq] to use burn pits as a means of waste disposal during the occupation period." *In re KBR, Inc., Burn Pit Litig.*, 268 F. Supp. 3d 778, 791 (D. Md. 2017) (quoting Lieutenant General (Ret.) Ricardo Sanchez, Commanding General of the First Armored Division, Fifth Corps Commander, and Commanding General of Combined Joint Task Force 7 in Iraq), *aff'd in part and vacated in part*, 893 F.3d 241, 262 (4th Cir. 2018) (affirming the district court's finding that the military mandated the use of open air burn pits in Iraq and Afghanistan). In fact, the military "made the sensitive decision to use burn pits, and only burn pits, at all [Forward Operating Bases] in Iraq and Afghanistan." *Id*. at 803.

64.    In 2010, the DoD issued a report to Congress regarding the military's use of open-air burn pits, indicating in every instance the use of burn pits was a command decision. More specifically, the report indicated that the use of burn pits was prohibited unless a forward operating base Combatant Commander determined no other method of trash disposal was feasible. DoD Report to Congress on the Use of Open-Air Burn Pits by the United States Armed Forces (Apr.

28, 2010).  The DoD report further explained that "[a]lternatives to burn pits are always sought out; however, they are not always available or safe. . . . For example, it is generally unsafe to locate waste dumps outside of controlled camp perimeters.  Frequent predictable transiting between camp and dump exposes troops and workers to enemy attack and [improvised explosive devices]."  *Id.*

65.    Moreover, no burn pit could continue to operate in perpetuity without additional command action.  In fact, in order for the use of a burn pit to continue past 180 days, the combatant commander was required to justify why their forward operating base still needed to dispose of waste in a burn pit.  *DoDI 4715.19.*

66.    Open-air burn pits used by the military must comply with specific requirements set forth by the DoD, including the location being "coordinated with the requisite security, safety, and appropriate medical authorities" and "controlled to prevent unauthorized persons from approaching the site."  DoDI 4715.19, at 7.  The DoD also sets forth requirements on the type of waste that can be burned in open-air burn pits.  *Id*. at 8.

67.    In 2019, the Department of Defense issued a report to Congress explaining the military's "continued use of open burn pits."  DoD Open Burn Pit Report to Congress (Apr. 10, 2010).  Here, the DoD explained that several factors, including "the mission focus and the rotation of deployed personnel," and that "DoD policy discourages investment in robust facilities at contingency locations or capabilities which increase fuel consumption without increasing lethality of force" required the continued use of open-air burn pits by the military.  *Id.* at 3.

68.    The Department of Defense's Instruction guiding the military's use of open-air burn pits, DoDI 4715.19, remains in effect to this day.

**The PACT Act**

69.     On August 10, 2022, the PACT Act became law.  The PACT Act expanded eligibility for VA benefits, including for post-9/11 veterans who served in certain locations with military burn pits.  *See* 38 U.S.C. § 1120.

70.     The PACT Act set forth a "presumption of service connection for certain diseases associated with exposure to burn pits and other toxins."  *Id*.  In relevant part, the PACT Act's "[p]resumption of service connection for certain diseases associated with exposure to burn pits and other toxins" requires the VA to consider the PACT Act Conditions to "have been incurred in or aggravated during active military, naval air, or space service, notwithstanding that there is no record of evidence of such disease during the period of such service" for covered veterans.  38 U.S.C. § 1120(a).

71.     The PACT Act defines an "open burn pit" as "an area of land that (A) is designated by the Secretary of Defense to be used for disposing solid waste by burning in the outdoor air; and (B) does not contain a commercially manufactured incinerator or other equipment specifically designed and manufactured for the burning of solid waste."  Honoring our PACT Act of 2022, Pub. L. No. 117-168, 136 Stat. 1759, 1793 (2022).

72.     "Covered veterans" are defined to include any veteran who (A) on or after August 2, 1990, performed active military, naval, air, or space service while assigned to a duty station in, including air space above Bahrain, Iraq, Kuwait, Oman, Qatar, Saudi Arabia, Somalia, or United Arab Emirates; or (B) on or after September 11, 2001, performed active military, naval, air, or space service, while assigned to a duty station, including the airspace above Afghanistan, Djibouti, Egypt, Jordan, Lebanon and Syria.  38 U.S.C. §§ 1119(c)(1); 1120(c).

**Army Policy of Denying Combat Related Designations for Burn Pit Claims**

73.    The Army PEB has a systemic practice and policy of denying combat-related findings for medical retirement purposes for unfitting PACT Act Conditions on the basis that military burn pits do not qualify as IOWs.

74.    The Army PEB justifies its denial of combat-related findings for medical retirement purposes for PACT Act Conditions by finding that burn pits are not specifically designed for military since they are also used in civilian contexts worldwide.  Rather than treat the burn pit itself as an IOW, the PEB requires that a service member demonstrate that the precise contents burned inside the pit at the time of the exposure were *themselves* IOWs (*e.g.*, tanks, Humvees, weapons). For instance, when reviewing LTC McIntyre's burn pit claim, the PEB stated on June 13, 2023, that "LTC McIntyre testified to being exposed to burn pit fumes, while she was deployed and carrying out her duties, she presented no evidence as to what was being burned at the time of her exposure. . . . Moreover, burn pits are utilized worldwide and not just incident to U.S. Military operations."

75.    Similarly, the PDA, in its May 8, 2023 review of SFC Smoke's case stated that "this Agency does not apply the policy that burn pits should arbitrarily be identified as an [IOW] . . .  Currently, there is no DoD guidance that the PACT Act is making the presumption that burn pits are an [IOW]."

76.    As the PEB did for LTC McIntyre, the PDA refused to find SFC Smoke's asthma combat-related because "he testified to having never personally visited the burn pits nor personally threw any items directly into the burn pit himself during his deployment to the Iraq Patrol Base Summers from January 2009 – September 2009 . . . he stated that unwanted waste was thrown into the pits such as building and construction materials, various paints, batteries, food waste, medical waste, plastic, rags, [and] building plaster particulates."

77.    The Army's practice and policy of medically retiring soldiers for PACT Act Conditions without also finding them combat-related is arbitrary, capricious, unsupported by substantial evidence, and contrary to law.  As explained further below, every military burn pit in the relevant location and time period constitutes a device designed primarily for and in use by military service.  Moreover, each unfitting condition responsible for the Plaintiffs' medical retirements that is a PACT Act Condition is presumed to have been caused by fumes and/or gases emanating from the burn pits.

78.    First, the Army's assertion that burn pits are not IOW is expressly contradicted by the Department of Defense's long-held assertion that burn pits were a necessity for combat operations.  In fact, the Department of Defense, in its own Instruction, defines a "burn pit" as "[a]n area, not containing an incinerator or other equipment specifically designed for burning of solid waste, designated for the purpose of disposing of solid waste by burning in the outdoor air at a location with more than **100 attached or assigned personnel and that is in place longer than 90 days**."  DoDI No. 4715.19 (emphasis added).  Thus, by definition, military burn pits, as opposed to ones used in a civilian context, are always designed for a particular military use:  the disposal of waste where there is a military presence of 100 or more personnel for over 90 days.

79.    Second, that a burn pit can only be used where a Combatant Commander responsible for operational planning and execution determines that no alternative disposal method is feasible demonstrates that burn pits, in the military context (*e.g.*, those attached to forward operating bases), are IOWs designed primarily for and in use by military service.  Moreover, the fact that command discretion is needed highlights that burn pits are deliberately designed to meet the waste disposal needs of military operations in hostile environments.

80.    Third, the Department of Defense's acknowledgement that burn pits were needed because "[f]requent predictable transiting between camp and dump exposes troops and workers to enemy attack and improvised explosive devices (IEDs)" also demonstrates that military burn pits should unequivocally be considered IOWs: they are designed to mitigate risks associated with waste transportation and to contribute to operational security.

81.    Finally, that burn pits are also used in civilian contexts does not bar military burn pits from being considered an IOW. Like military parachutes, military burn pits are IOWs because they are specifically designed for military use pursuant to specifications to which non-military burn pits are not subject. *See* DoDI No. 4715.19. Further, the use of burn pits subjects certain servicemembers to hazard peculiar to military service—the unavoidable exposure to burn pits and their fumes while deployed—and as such, burn pits are IOWs.

82.    Lastly, the Army's findings in response to CRSC petitions further confirm that burn pits are an IOW such that unfitting conditions covered by the PACT Act warrant a combat-related designation under 26 U.S.C. § 104. In LTC McIntyre and SFC Smoke's cases, each were awarded CRSC benefits on the basis that their conditions were due to an IOW, specifically burn pits. Yet, the Army has arbitrarily found in PEB proceedings that burn pits are not an IOW. On the one hand the FPEB in its Revised PEB Proceeding for SFC Smoke stated "[a]ccording to current policies and regulations, burn pits . . . do not rise to the level of being . . . an instrumentality of war." In direct contrast, the Army CRSC Board awarded CRSC for conditions covered by the PACT Act, such as asthma and carcinoma diagnosed after exposure to burn pits after finding them to be a verified disability as combat-related due to an Instrumentality of War. The Army CRSC Board's conclusions correctly interpret the definition of IOW, and the Army PDA's policy of refusing to recognize burn pits as an IOW—and thus denying a combat-related finding for unfitting PACT

20

Act Conditions—is arbitrary and capricious, unsupported by substantial evidence, and contrary to law.

## CLASS ACTION IS APPROPRIATE

83.     Plaintiffs seek to certify a class defined as

United States Army veterans whose final medical retirement decision was issued after August 10, 2022 and who (1) were medically retired for an unfitting PACT Act Condition; (2) served in locations and during timeframes defined in 38 U.S.C. § 1119; and (3) received a final medical retirement decision dated after August 10, 2022 that found their unfitting PACT Act Condition was not "combat-related" under 26 U.S.C. § 104 despite their exposure to military burn pits and the PACT Act presumption that such exposure caused them to incur their unfitting disability.

84.     This class satisfies each requirement of Federal Rule of Civil Procedure 23(a).

85.     On information and belief, this class is sufficiently numerous that joinder of all members is impracticable.  Fed. R. Civ. P. 23(a)(1).  The class is sufficiently numerous because: publicly available Department of Defense reports demonstrate that more than 10,000 Army service members were medically retired in Fiscal Year 2022, the last year for which information is publicly available; the number of servicemembers who have served in locations covered by PACT Act burn pit presumptions is in the hundreds of thousands; and the PEB has a policy of denying retirement benefits for servicemembers with PACT Act Conditions exposed to burn pits without evidence of what was burned in the pits.  Thus it is likely that the number of the Army veterans retired for PACT Act Conditions who have been denied combat-related status under 26 U.S.C. § 104 exceeds the number necessary for class certification.  Because PEB decisions are not publicly available, only Defendant(s) know the exact number of class members, and Plaintiffs intend to seek discovery to determine these numbers.

86.     There are questions of law or fact common to this class.  *See* Fed. R. Civ. P. 23(a)(2).  The central issue in each veteran's claim involves the legal question of whether burn pits

are IOWs.  It also involves the common question of whether it is arbitrary and capricious for the Army to consider burn pits to be IOWs when it relates to CRSC determinations, but not to consider burn pits to be IOWs for combat-related findings in the PEB process.

87.    The claims of Plaintiffs SFC Smoke and LTC McIntyre in this case are typical of the claims of the entire class.  *See* Fed. R. Civ. P. 23(a)(3).  It is undisputed that SFC Smoke and LTC McIntyre were each medically retired for a PACT Act Condition, served in locations and during timeframes defined in 38 U.S.C. § 1119, and were denied a combat-related finding by the PEB.  Their claims that they should have received a combat-related finding by the PEB because military burn pits constitute an IOW are typical of the class.

88.    The representative parties in this case (Plaintiffs SFC Smoke and LTC McIntyre) and their counsel will fairly and adequately protect the interests of the entire class.  *See* Fed. R. Civ. P. 23(a)(4).  Through this litigation, Plaintiffs SFC Smoke and LTC McIntyre are determined to obtain a change to the Army's policy so that the numerous veterans, who served in the locations and during the timeframes defined in 38 U.S.C. § 1119 and were subsequently retired for PACT Act Conditions like theirs, can receive the combat-related finding from the PEB that they deserve.  Plaintiffs are represented by experienced class action counsel with substantial experience in complex civil and APA litigation.

89.    The requirements of Federal Rule of Civil Procedure 23(b) are also satisfied.  Under Rule 23(b)(2), the Defendant has acted or refused to act on grounds that apply generally to the class, so final injunctive and declaratory relief is appropriate respecting the class as a whole.  The Defendant has stated that its decision is "according to current policies and regulations" pursuant to which "burn pits do not rise to the level of being an IOW."  The current policies and regulations apply to all members of the class, thus satisfying the requirements of Rule 23(b)(2).  Permitting

Plaintiffs to maintain this action on behalf of the proposed Class will bring the appropriate injunctive and declaratory relief for the Class as a whole.

**COUNT I – VIOLATION OF ADMINISTRATIVE PROCEDURE**
**ACT (5 U.S.C. § 706(2)(A))**

90.    Plaintiffs incorporate the allegations in paragraphs 1 through 89 above.

91.    10 U.S.C. § 1201 requires the Secretaries of each military department to medically retire service members who are unfit to perform the duties of the member's office, grade, rank, or rating because of physical disability whenever that disability is rated a combined 30 percent disabling.

92.    Upon determining a service member is eligible for medical retirement, the Secretaries of the Military Departments are required by 26 U.S.C. § 104 to determine if that service member's unfitting condition is "combat-related."  If so, the disability retired pay is excluded from the definition of federal gross income.  26 U.S.C. § 104(b)(2)(C).  One definition of "combat-related is" an injury or sickness "which is caused by instrumentality of war."  26 U.S.C. § 104(b)(3)(B).  An IOW is defined by the Department of Defense as "a vehicle, vessel, or device designed primarily for military service and in use by a military service at the time of the occurrence or injury."  Moreover, a disability is considered incurred due to an IOW whenever it is "incurred . . . as a result of wounds caused by a military weapon, accidents involving a military combat vehicle, injury or sickness caused by fumes, gases, or explosion of military ordnance, vehicles, or material."

93.    When making the required tax determination for Plaintiffs and the proposed Class members, the Army has a practice or policy of refusing to designate burn pits as IOWs despite the fact that:  (A) each Plaintiff and Class member was retired due to a PACT Act Condition following a final medical retirement decision issued after August 10, 2022; (B) each Plaintiff and Class

23

member served in a location and during timeframes defined in 38 U.S.C. § 1119; and (C) the Department of Defense has long explained that burn pits, located in forward operating bases, are devices designed primarily for military service and necessary to ensure the viability of military operations, the safety of troops, and the removal of waste.

94.    Defendant's actions denying combat-related findings to Plaintiffs and Class members have and continue to deprive Plaintiffs and Class members of the disability benefits to which they are entitled under 10 U.S.C. §§ 1201, 1202, and 1203.

95.    Under the APA, this Court has authority to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious . . . or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  Defendant's actions are arbitrary, capricious, and otherwise not in accordance with law because they deny combat-related findings to Plaintiffs and Class members on the basis that burns pits do not qualify as IOWs, and yet the Army CRSC Board awards CRSC on the basis that burn pits do qualify as IOWs.  Plaintiffs are therefore entitled to the relief requested in this Complaint.

## PRAYER FOR RELIEF

SFC Kyle A. Smoke, LTC Jennifer M. McIntyre, and the Class members they represent, respectfully request that this Court enter judgment against the Defendants and award the following relief:

a.    Certify this case as a Class Action;

b.    Appoint SFC Smoke and LTC McIntyre as the representatives of the Class;

c.    Appoint Plaintiffs' Counsel as Class Counsel;

d.    Find that the Army's conclusions (acting through the PEB and/or PDA)—denying Plaintiffs and Class members who served in locations and during timeframes defined in 38 U.S.C. § 1119 and who were retired for an unfitting PACT Act Condition following a final medical

retirement decision issued after August 10, 2022, and whose unfitting PACT Act Condition was found not "combat-related" under 26 U.S.C. § 104—were arbitrary and capricious, unsupported by substantial evidence, and contrary to law;

e.      Hold unlawful and set aside under 5 U.S.C. § 706(2) the Army's policy of concluding that burn pits are not an IOW;

f.      Declare, under the Declaratory Judgment Act, that the Army (acting through the PEB and/or PDA) has violated the legal rights of Plaintiffs and Class members;

g.      Grant relief to Plaintiffs and Class members by vacating the Army's final medical retirement decision and awarding a combat-related designation for their unfitting PACT Act Condition;

h.      Grant injunctive relief by enjoining the Army from applying its unlawful policy going forward;

i.      Award Plaintiffs the costs and disbursements of this proceeding, and attorneys' fees; and

j.      Grant such other, further, or different relief as the Court deems just and proper.

Dated: October 15, 2024                    Respectfully submitted,

                                        /s/ Daniel J. Hay
                                         Daniel J. Hay, D.C. Bar. No. 1047969
C.K. Kevin Park, D.C. Bar No. 1644103
(*pro hac vice forthcoming*)
Susan K. Whaley, D.C. Bar No. 90018472
(*pro hac vice forthcoming; admission pending*)
Sidley Austin LLP
1501 K Street, N.W.
Washington, DC 20005
Telephone: (202) 736-8000
Facsimile: (202) 736-8711
dhay@sidley.com
ck.park@sidley.com
susan.whaley@sidley.com

Elizabeth M. Chiarello, IL Bar No. 6285915
Emily M. Wexler, IL Bar No. 6270284
Mark C. Priebe, IL Bar No. 6336588
(*pro hac vice forthcoming*)
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036
echiarello@sidley.com
ewexler@sidley.com
mpriebe@sidley.com

Rochelle Bobroff, DC Bar No. 420892
Esther Leibfarth, DC Bar No. 10164515
NATIONAL VETERANS LEGAL SERVICES
PROGRAM
1100 Wilson Boulevard
Arlington, VA 22209
Telephone: (202) 621-5709
Facsimile: (202) 223-9199
rochelle@nvlsp.org
esther@nvlsp.org